UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| ASHLEE E. PADGETT,<br>CASEY A. BOYER,<br>KRISTY A. MARTIN,<br>SEAN R. GIOLITTO,<br>CHRISTOPHER S. PENTECOST,<br>HALEY KANIZAR,<br><br>Plaintiffs,<br><br>v.<br><br>JACOB CARL BUTLER,<br>EVANSVILLE-VANDERBURGH SCHOOL<br>CORPORATION,<br>BOARD OF SCHOOL TRUSTEES OF THE<br>EVANSVILLE-VANDERBURGH SCHOOL<br>CORPORATION,<br>BRETT L. HAWKINS Clerk's Entry of Default<br>Entered on 12/14/2023,<br>DAY-DRIAN M. FRANKLIN Clerk's Entry of<br>Default Entered on 12/14/2023,<br><br>Defendants.<br>_____<br><br>THE VANDERBURGH COUNTY CYBER<br>CRIMES TASK FORCE,<br>THE VANDERBURGH COUNTY<br>PROSECUTOR'S OFFICE,<br><br>Miscellaneous. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 3:23-cv-00071-MPB-CSW |

**<u>ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiffs are the parents of four children, between the ages of five and eight, who were

victims of Defendant Jacob Butler ("Butler"), a convicted sex offender. Butler was a student at

the University of Evansville ("UE") and provided tutoring services at an elementary school

within the Evansville-Vanderburgh School Corporation. Plaintiffs sue Butler alongside the

Evansville-Vanderburgh School Corporation and its Board of Trustees (collectively, "EVSC

Defendants") for alleged failures that led to the exploitation of Plaintiffs' children. Before the Court is EVSC Defendants' Motion for Summary Judgment (Docket No. 171) as to all claims asserted against EVSC Defendants. For the reasons stated below, their Motion (Docket No. 171) is **GRANTED in part and DENIED in part.**

## I.    Background

The following facts are not in dispute and are viewed in the light most favorable to Plaintiffs. Defendant Butler was an education major at UE and desired to be a middle school teacher. (Docket No. 172 at ECF p. 9).[1] As part of his education degree, Butler took a class titled "Foundations and Diversity in American Education." (Docket No. 174 at ECF p. 1). This course was designed, in part, to give students "field experience" in a local school. (*Id.* at ECF p. 3). It contained a forty-hour practicum requirement that UE students could satisfy with certain partner schools. (Docket No. 175 at ECF pp. 19–20). For Butler's practicum requirements, he observed classes at Bosse High School. (Docket No. 172 at ECF p. 9). Additionally, Butler participated in UE's Tutoring Program, which offered tutoring services at different schools, including EVSC's Vogel Elementary School ("Vogel "). (*Id.* at ECF p. 11; Docket No. 175 at ECF p. 72). UE obtained funding for its tutoring program through the Governor's Emergency Education Relief ("GEER") fund. (Docket No. 180 at ECF p. 16). The Principal at Vogel, Ms. Lindauer ("Principal Lindauer"), agreed to take on tutors as part of this program. (Docket No. 186 at ECF p. 14). Butler expressed interest in the tutoring program and was placed at Vogel. (Docket No. 180 at ECF p. 39). The tutors that UE provided for its program were education majors who "already had their background check." (Docket No. 175 at ECF p. 45).

---

[1] The Court notes that EVSC Defendants failed to comply with its Practices and Procedures when filing their exhibits in support of their Motion for Summary Judgment. Rather than include all exhibits under one docket entry, each exhibit is filed separately, spanning Docket Nos. 172–219. While not fatal in the present case, EVSC Defendants are expected to adhere to the Court's Practices and Procedures in future filings.

Tutors at Vogel were subject to a Clinical Education Agreement executed between UE and EVSC as engaged in "[p]re-student teaching." (Docket No. 1-1 at ECF p. 106). The Agreement, which states that students "are not officers, employees, or agents of EVSC," requires EVSC to provide a mentor teacher for the students and to "provide appropriate supervision to student teachers and students in pre-student teaching experiences." (*Id.* at ECF p. 107). The Agreement also states that those engaged in pre-student teaching are "under the direction and control" of their supervisors while on EVSC premises. (*Id.*). Those in the UE tutor program were tasked with tracking their hours, and they were paid by UE. (Docket No. 180 at ECF p. 30).

Vogel also runs an after-school daycare program for parents who cannot pick their children up when school ends, which is distinct from the UE tutoring program. (Docket No. 185 at ECF p. 13). Vogel's daycare program is subject to mandatory staffing ratios. (Docket No. 228-2 at ECF pp. 5–6). It is a "licensing issue" if the daycare program does not have enough workers to supervise the children. (*Id.* at ECF p. 8). During the fall of 2021, the Vogel daycare was understaffed on multiple occasions. (*See* Docket No. 228-10 at ECF pp. 1–3) (identifying dates in October and November where the daycare had two employees supervising upwards of fifty children); *see also* Docket No. 228-2 at ECF p. 20 ("[H]aving two people there . . . would be a safety concern."). Ms. Pam Wilson served as the daycare coordinator and was "in charge" of the daycare program. (Docket No. 186 at ECF p. 21). Ms. Wilson identified that she reported to Principal Lindauer, (Docket No. 185 at ECF p. 21), though Principal Lindauer indicated that she was not Ms. Wilson's direct supervisor, (Docket No. 186 at ECF pp. 21–22). Ms. Carlada Patterson hired Ms. Wilson to run the daycare program. (Docket No. 228-2 at ECF p. 14). There were several disciplinary warnings, including instances of having a "bad attitude," issued against

Ms. Wilson prior to her hiring for the daycare position that Ms. Patterson characterized as "red flag[s]," though she had never seen these documented prior to her deposition. (*Id.* at ECF p. 16).

Parents of students enrolled in Vogel's daycare program received a permission slip asking if they would like for their child to participate in tutoring with UE students. (Docket No. 185 at ECF p. 13). Of the four children involved in this case, two signed up for the tutoring program, (Docket No. 193 at ECF p. 21; Docket No. 196 at ECF p. 21), but only one child participated, (Docket No. 196 at ECF p. 8). Six UE students, including Butler, signed up for the tutoring program at Vogel. (Docket No. 182 at ECF p. 2). Butler tutored for one hour after school, twice a week. (*Id.*). When Butler arrived at Vogel, he signed in and wore a UE nametag. (Docket No. 172 at ECF p. 15). He would proceed to the daycare program located in the school cafeteria. (*Id.* at ECF p. 19; Docket No. 186 at ECF p. 37). Ms. Wilson or other daycare workers would tell Butler that a particular student or students "needed certain help" with homework assignments. (Docket No. 172 at ECF p. 13). Ms. Wilson would also prepare a basket with supplies for the tutors. (Docket No. 185 at ECF p. 21). Butler would tutor these students in a classroom down the hall from the cafeteria. (Docket No. 172 at ECF p. 18–19). Some days, Butler tutored two students at the same time, (*id.* at ECF p. 19), though Ms. Wilson claims that Butler preferred to tutor in a "one-on-one" setting (Docket No. 228-1 at ECF p. 8). When in this classroom, Butler was not under constant supervision by EVSC employees, (Docket No. 172 at ECF p. 19), and Ms. Wilson was unable to see into the classroom from her position in the cafeteria, (Docket No. 228-1 at ECF p. 7). Indeed, "[d]ue to [the daycare] group [being] short-staff[ed]" Ms. Wilson did not check in on the tutoring room, nor did she ask other daycare workers to observe the tutors. (*Id.* at ECF p. 10). Other UE tutors would also use this classroom at the same time as Butler. (Docket No. 172 at ECF p. 20).

4

Across from the cafeteria and next to the tutoring room, there is a children's restroom. (Docket No. 186 at ECF p. 131). When Butler tutored at Vogel, he would escort the children to the restroom and "supervise" them. (Docket No. 172 at ECF p. 22). He did not "directly" ask Ms. Wilson for permission to do this, (*id.* at ECF p. 23) and would instead "have the child say to [Ms. Wilson] that they need to wash their hands," (Docket No. 185 at ECF p. 19). At this time, neither Vogel nor EVSC had a policy in place governing the use of restrooms or child supervision in restrooms. (Docket No. 186 at ECF pp. 32–33). In response to a question as to whether it was "okay" for Butler to be in the restroom with a child, Ms. Wilson stated that it would not be okay, though she did admit that in an emergency, such as a bloody nose, assisting the child in the restroom "w[ould] be a good thing." (Docket No. 228-1 at ECF pp. 13–14).

According to Butler, he was the only adult in the restroom, (Docket No. 172 at ECF p. 28). He would "spend an average of five minutes" supervising children in the restroom while tutoring. (*Id.*). Additionally, Butler "often used the [children's] restroom" after he finished tutoring for "approximately [fifteen] minutes" before leaving Vogel. (*Id.* at ECF p. 29). During the second trip to the restroom, he would also "supervise" any children that happened to be in the restroom. (*Id.* at ECF pp. 30–31). On average, between the two trips, Butler would be in the children's restroom for twenty minutes. (*Id.* at ECF p. 31).

While using the restroom for personal reasons, Butler "noticed that other children intermittently came in" to use the restroom. (*Id.* at ECF p. 32). He would then "take pictures and videos of the children . . . while they used the restroom." (*Id.*). Butler acknowledged that he did this "pretty much every time" he tutored at Vogel, starting in late October or early November of 2021. (*Id.* at ECF p. 34). Indeed, he would record and photograph the children on both his first

and second trips to the restroom. (*Id.*). He committed these acts for sexual gratification, and did so "because [he] knew no one else was watching[.]" (*Id.* at ECF pp. 35–36).

On December 3, 2021, two parents not associated with this case met with Principal Lindauer and reported that their child saw a phone while using the restroom. (Docket No. 186 at ECF p. 55). Principal Lindauer talked to the child, who said that the person with the phone "ha[d] big feet." (*Id.* at ECF p. 56). After this conversation, Principal Lindauer spoke with Ms. Chanel Malone, a daycare worker, and Ms. Wilson to gather information. (Docket No. 187 at ECF p. 1). Ms. Wilson provided a sign-in sheet from the previous day and noted that Butler was in attendance. (Docket No. 186 at ECF p. 57). Ms. Wilson also reported that she saw Butler leaving the Vogel premises—via a Ring camera—roughly half-an-hour after the end of his tutoring shift. (Docket No. 185 at ECF p. 11). Additionally, Ms. Wilson relayed to Principal Lindauer that Butler previously told her a child, other than the one who reported the phone that morning, "needed to go wash his hands." (Docket No. 187 at ECF p. 1). Principal Lindauer spoke to the second child, who confirmed that Butler was in the bathroom with him and said that he saw Butler on his phone while in the restroom. (*Id.*).

Principal Lindauer then contacted Officer Alford, an EVSC police officer, and recounted her findings and concerns about Butler. (Docket No. 186 at ECF p. 57). Officer Alford contacted Chief Cullum, with UE Public Safety, who located Butler. (Docket No. 190 at ECF p. 8). Both spoke with Butler on December 6, 2021, and he agreed to answer questions. (Docket No. 191 at ECF p. 1). In that interview, Butler admitted to being in the restroom with the children and consented to a search of his phone. (*Id.* at ECF p. 2). After receiving a search warrant, a forensic examination revealed "numerous photos" of juveniles in the children's bathroom "in the act of urinating." (*Id.*). Officer Alford then had another interview with Butler, where Butler admitted to

taking the photos. (*Id.*). Additionally, Butler admitted to inappropriately touching a juvenile's "genital area," on two separate occasions, once in the classroom and once in the restroom. (Docket No. 190 at ECF pp. 16–17). Butler was subsequently arrested and taken to the Vanderburgh County Jail. (Docket No. 191 at ECF p. 2). UE expelled Butler in January 2022, (Docket No. 200 at ECF p. 2), and he ultimately pleaded guilty to multiple child exploitation charges, (Docket No. 54-5 at ECF pp. 1–3).

Parents of four children who were identified in Butler's photos brought this suit in Vanderburgh County, and it was removed to federal court on April 27, 2023. (Docket No. 1). The case initially included EVSC Defendants and UE, though Plaintiffs dismissed UE from this action. (Docket Nos. 1, 237). EVSC Defendants filed a Motion to Dismiss (Docket No. 31), which this Court granted in part and denied in part (Docket No. 137). They then moved for summary judgment (Docket No. 171) on all remaining claims.

## II.    Legal Standard

Summary judgment is proper and shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must show there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing summary judgment motions, this Court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016).

Because courts must not "scour the record in search of evidence to defeat a motion for summary judgment," the nonmoving party has "the responsibility of identifying the evidence

upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). The party opposing summary judgment must not merely rely on allegations in its pleadings, but instead must present definite, competent evidence in rebuttal. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248.

## III. Discussion

Plaintiffs assert claims against EVSC Defendants for negligence, negligence per se, negligent infliction of emotional distress, intentional infliction of emotion distress, invasion of privacy, battery, sexual battery, and a violation of a federal child pornography law, 18 U.S.C. § 2255(a). [2] In advancing these individual claims, Plaintiffs seek to hold EVSC Defendants liable for Butler's actions under two broad theories of vicarious liability: respondeat superior and apparent agency. In addition to these claims, Plaintiffs assert a Title IX claim and multiple direct liability claims against EVSC Defendants. The Court will first analyze Plaintiffs vicarious liability claims before turning to Title IX and direct liability.

### A. Respondeat Superior

Respondeat superior allows for an employer to be held "liable for its *employees'* actions that were committed within the *scope* of their employment." *Clark v. Aris, Inc.*, 890 N.E.2d 760, 765 (Ind. Ct. App. 2008) (citing *Bd. of Sch. Comm'rs v. Pettigrew*, 851 N.E.2d 326, 332 (Ind. Ct.

---

[2] The Court assumes without deciding that Plaintiffs may pursue their federal child pornography law claim against EVSC Defendants under a theory of vicarious liability. Notably, there is an ongoing disagreement amongst district courts. *Compare G.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-cv-3788, 2024 WL 1347722, at *3 (S.D. Ohio Mar. 29, 2024) (allowing vicarious liability claims to proceed at the motion to dismiss stage), *with E.M. v. Varsity Brands, LLC*, No. 2:22-cv-9410, 2024 WL 2808183, at *7 (C.D. Cal. May 31, 2024) (declining to apply vicarious liability at the motion to dismiss stage). Yet this Court need not weigh in on this issue because Plaintiffs' vicarious liability claims are ultimately unsuccessful.

App. 2006)) (emphasis added). EVSC Defendants challenge both aspects of respondeat superior liability. First, they argue that Butler was not an EVSC employee and that they are therefore immune from liability under the Indiana Tort Claims Act ("ITCA"). Second, they argue that even if Butler was an employee, his actions were not within the scope of his employment.

Under the ITCA, "[a] governmental entity . . . is not liable if a loss results from . . . [t]he act or omission of anyone other than the governmental entity or the governmental entity's employee." Ind. Code § 34-13-3-3(a)(10). The ITCA applies to school corporations, like EVSC Defendants, *see Jacks by Jacks v. Tipton Comm. School Corp.*, 94 N.E.3d 712, 716 (Ind. Ct. App. 2018), and the subsection cited above "applies in actions seeking to impose vicarious liability by reason of conduct of third parties other than governmental employees acting within the scope of their employment," *id.* at 717 (citation and quotations omitted). An employee is defined as "a person presently or formerly acting on behalf of a governmental entity, whether temporarily or permanently or with or without compensation," Ind. Code § 34-6-2-38(a), but does not include "an independent contractor," *id*. § 34-6-2-38(b)(1). Thus, the threshold question is whether Butler is an employee of EVSC or is better classified as an independent contractor. Answering that question generally requires courts to apply a non-exhaustive, ten-factor balancing test. *See Mortg. Consultants, Inc. v. Mahaney*, 655 N.E.2d 493, 495–96 (Ind. 1995).

For purposes of the respondeat superior analysis, the Court assumes without deciding that Butler is an employee of EVSC Defendants. If Plaintiffs are unable to show that there is a genuine issue of material fact as to whether Butler was acting within the scope of his employment when he took photos and videos in the children's restroom at Vogel, then Butler's status as an employee is beside the point. Thus, the Court will turn to the determinative issue in question: scope of employment.

9

### 1. Scope of Employment

For vicarious liability to be imposed on an employer for the torts of its employee, the employee must have "inflicted harm while acting within the scope of employment." *Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008) (citation and quotations omitted). For the injurious act to fall within the scope of employment, it "must be incidental to the conduct authorized or it must, to an appreciable extent, further the employer's business." *Id.* at 283–84 (citing *Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 453 (Ind. 2000)). The fact that an employee commits a criminal act "is not, in itself, a defense to vicarious liability." *City of Indianapolis v. West*, 81 N.E.3d 1069, 1072 (Ind. Ct. App. 2017) (citing cases). Instead, "[t]he critical inquiry is whether the tortious act arose naturally or predictably from the employment context." *New Augusta N. Pub. Acad. v. K.G.*, 219 N.E.3d 175, 182 (Ind. Ct. App. 2023) (quoting *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 464 (Ind. 2018)). While the scope of employment question is generally one of fact, courts may conclude that an act was not within the scope of employment when the relevant facts are undisputed, as they are here. *Cox*, 107 N.E.3d at 460 (citations omitted).

EVSC Defendants argue that existing precedent precludes the Court from finding that Butler's actions were within the scope his employment, while Plaintiffs argue that a reasonable jury could find that the photographs, videos, and molestation that Butler engaged in naturally or predictably arose from his duties as a tutor. The Court agrees with EVSC Defendants. The operative caselaw indicates that Butler was *not* acting within the scope of his employment, and as a result, EVSC Defendants cannot be held liable under the doctrine of respondeat superior.

In *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 616 (7th Cir. 2008), the Seventh Circuit affirmed the district court's grant of summary judgment in favor of the school corporation on the issue of vicarious liability. There, a teacher and assistant band director at a

high school began a sexual relationship with a student who participated in the band. *Id.* at 603. The relationship included sexual encounters that occurred on school property, including in the band room and music practice room. *Id.* The minor's parents did not learn about the sexual contact until their daughter was hospitalized two years later, and they subsequently sued the teacher and the school corporation. *Id.* at 603–04. In affirming the district court's decision, the Seventh Circuit noted that "Indiana courts have found whether sexual misconduct is within the scope of one's employment to be a genuine issue of fact only in circumstances where the employee's job duties involved extensive physical contact with the alleged victim, such as undressing, bathing, measuring, or fitting." *Id.* at 612 (collecting cases). The court also noted that the teacher's "authorized duties did not include physical contact with his high school students," and that the sexual encounters were motivated by his own "personal desire to engage in a sexual relationship" rather than motivated by the school district's interests. *Id.* at 614.

The Seventh Circuit's analysis in *Hansen* rested on its comparison of five cases, three of which the parties rely on here. In *Stropes by Taylor v. Heritage House Childs. Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 250 (Ind. 1989), the Indiana Supreme Court found that a genuine issue of material fact precluded summary judgment on Plaintiff's vicarious liability claim. A child suffering from cerebral palsy and severe mental impairment was placed at Heritage House and needed extensive help with everyday life activities. *Id.* at 245. A nurse's aide, employed by Heritage House, was tasked with feeding, bathing, and changing the child, among other duties. *Id.* One day, while changing the child's bedding and clothes, the aide sexually assaulted the child. *Id.* Another employee witnessed this incident, and the aide pleaded guilty to multiple felonies. *Id.* The child, by his next friend, sued Heritage House under the doctrine of respondeat superior, though the trial court granted summary judgment on that claim, finding "the act of committing a

11

sexual assault was . . . outside the scope of [the aide's] employment." *Id.* at 246. The Indiana Supreme Court reversed, observing that the criminal nature of the aide's actions did not preclude a finding of liability for Heritage House "because the criminal acts originated in activities so closely associated with the employment relationship as to fall within its scope." *Id.* at 247. The court highlighted that the aide "began the episode by performing a fully authorized act" in changing the bed sheets, and that the aide was further authorized to touch the child's genitalia when bathing and changing the child's clothes. *Id.* at 249. Thus, while "[r]ape and sexual abuse constitute arguably the most egregious instances of wrongful acts" an employee could commit, the flagrant nature of the sexual assault "is not per se determinative of the scope of employment question." *Id.* Simply put, the aide's actions "were, at the very least, sufficiently associated with [his] authorized duties to escape dismissal on summary judgment." *Id.* at 250. The trial court was thus reversed on summary judgment. *Id.*

Similarly, the Indiana Court of Appeals affirmed a trial court's denial of summary judgment as to plaintiff's respondeat superior theory in *Southport Little League v. Vaughan*, 734 N.E.2d 261, 270 (Ind. Ct. App. 2000). In *Vaughan*, parents of children participating in little league baseball sued Southport Little League for the wrongful acts of an equipment manager. *Id.* at 267. The equipment manager fitted the children with uniforms, and while fitting them, pulled down the underwear of multiple children and viewed their genitalia. *Id.* at 266–67. He also molested two children. *Id.* at 267. The equipment manager pleaded guilty to multiple felony charges, but the court found that summary judgment was not proper on the respondeat superior claim because the designated evidence showed that some of his acts "were authorized (such as fitting the youths' uniforms)" when he viewed the children's genitalia and molested them. *Id.* at 270. Relying on *Stropes*, the court highlighted the need for the employees acts to be "sufficiently

associated with" duties that the employee was authorized to perform to preclude summary judgment. *Id.* (quoting *Stropes*, 547 N.E.2d at 245).

On the other hand, the Indiana Supreme Court declined to impose liability on an employer for the acts of its employee in *Barnett*, 889 N.E.2d at 286. There, plaintiff sought public assistance from a deputy trustee of an Indiana township and was told that she would need to perform some "bookwork" to receive assistance. *Id.* at 283. After plaintiff performed the bookwork, the deputy trustee reviewed the work before blocking the office room door and sexually assaulting the plaintiff. *Id.* While the plaintiff sought to hold the employer liable under respondeat superior, the court found that the employee's actions were outside the scope of his employment. *Id.* at 286. In so holding, the court clarified that the scope of employment question centers on "how the employment relates to the context in which the commission of the wrongful act arose." *Id.* at 285 (quoting *Stropes*, 547 N.E.2d at 249). Unlike the employees in *Stropes*, "the deputy trustee's duties and authority diff[ered] vastly," in nature. *Id.* at 286. Because the employee in *Barnett* "was not explicitly or impliedly authorized to touch or confine" people— beyond a greeting handshake—"[h]is alleged acts of confining, sexually touching, and raping the plaintiff were not an extension of authorized physical contact." *Id.* at 286. Neither were they "incidental" or "sufficiently associated with the deputy trustee's authorized duties." *Id.* Thus, the deputy trustee's employer could not be held vicariously liable. *Id.*

*Hansen* harmonized *Stropes*, *Vaughan*, and *Barnett*, and found that the assistant band director's sexual contact with a student on school property was more like *Barnett* and less like *Stropes* or *Vaughan*. 551 F.3d at 614. Simply put, it takes facts showing the employee's job "involved extensive physical contact with the alleged victim, such as undressing, bathing, measuring, or fitting" to preclude summary judgment on the scope of employment question. *Id.*

13

at 612. Otherwise, the employee's sexual misconduct will not be within the scope of their employment, and the employer cannot be held liable under a theory of respondeat superior. A recent Indiana Court of Appeals case confirmed these principles. *See K.G.*, 219 N.E.3d at 184 (concluding the trial court erred in granting summary judgment on respondeat superior issue when an employee tasked with undressing, cleaning, dressing, and physically moving a child molested her).

Applying these cases to the facts at hand, no reasonable jury could find that Butler's actions arose "naturally or predictably" from his employment as a tutor at Vogel. *Id.* at 182. Instead, the undisputed facts show that his actions are like those of employees in *Hansen* and *Barnett* who acted outside the scope of their employment. When Butler arrived for tutoring, he was authorized to work with students, either in a small group or individual setting, in a room down the hall. (Docket No. 228-1 at ECF pp. 7–8). But there is no evidence that shows Butler's tutoring duties "involved extensive physical contact with the [victims], such as undressing, bathing, measuring, or fitting" as in cases where courts declined to grant summary judgment on the scope of employment question. *Hansen*, 551 F.3d at 612. Indeed, he was there "to tutor specific children in [Vogel's] after school daycare program," and "was not authorized to have physical contact" with any student he tutored. (Docket No. 213 at ECF p. 1). At most, in an emergency, such as a bloody nose, assisting the child in the restroom "w[ould] be a good thing." (Docket No. 228-1 at ECF p. 14). Yet helping a child with a bloody nose, authorized in an emergency, is a far cry from taking photos and videos of children using the restroom or molesting them. Butler was not in charge of changing the clothes or cleaning the genital area of the children, like the employees in *K.G.* or *Stropes*, nor was he authorized to have extensive contact with children like the equipment manager in *Vaughan*. At bottom, Butler's actions were

14

not "incidental to the conduct authorized" by EVSC Defendants and did not, "to an appreciable extent," advance their business. *Barnett* 889 N.E.2d at 283.

Plaintiffs rely on *Community Health Network, Inc. v. McKenzie*, 185 N.E.3d 368 (Ind. 2022) in support of their argument about Butler's scope of employment. In *McKenzie*, the Indiana Supreme Court found genuine issues of material fact prevented summary judgment as to scope of employment when a health care provider's medical records coordinator illegally accessed information from confidential medical records. *Id.* at 374. In reaching its conclusion, the court relied on numerous factors, including the company's control over the employee's access to the records and the employee's "lack of understanding" regarding their authorized access. *Id.* at 378. But to the extent Plaintiffs analogize Butler's ability to access the children's restroom to the access of medical records in *McKenzie*, such a comparison avoids the mountain of caselaw on the scope of employment question related to sexual misconduct. *Hansen*, 551 F.3d at 612.

Because there is no genuine issue of material fact as to respondeat superior liability, Defendants' Motion for Summary Judgment (Docket No. 171) is **GRANTED** on this basis.

## 2.  Agency Theory

Plaintiffs' claims pursuing vicarious liability take an additional form under the law of agency. Agency relationships are "fiduciary relationship[s] that arise[] when one person . . . manifests assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Yost v. Wabash Coll.*, 3 N.E.3d 509, 518–19 (Ind. 2014) (quoting Restatement (Third) of Agency § 1.01 (2006)). These relationships take two forms: actual agency and apparent agency. To create an actual agency relationship, there must be: (1) manifestation of consent by the principal; (2) acceptance by the agent; and (3) control exerted by the principal over the agent. *Glispie v. State*,

15

955 N.E.2d 819, 822 (Ind. Ct. App. 2011). Forming an apparent agency relationship also includes a manifestation of the principal. *Id.* "However, the required manifestation is one made by the principal to a third party who in turn is instilled with a reasonable belief that another individual is an agent of the principal." *Id.* (quoting *Hope Lutheran Church v. Chellew*, 460 N.E.2d 1244, 1248 (Ind. Ct. App. 1984)). The party asserting the agency relationship bears "the burden of proving its existence." *Id.* (citing *Smith v. Brown*, 778 N.E.2d 490, 495 (Ind. Ct. App. 2002)).

As to Plaintiffs' actual agency theory, they state that "there was an actual agency relationship" between EVSC Defendants and Butler "given the relationship of employer and employee." (Docket No. 229 at ECF p. 37). While Plaintiffs cite to evidence as to EVSC Defendants' control over Butler, by way of the Clinical Education Agreement, they do not set forth *any* evidence as to the first two elements of actual agency—EVSC Defendants manifestation of consent to forming an actual agency relationship and Butler's acceptance of that manifestation. *Glispie*, 955 N.E.2d at 822. Moreover, the Clinical Education Agreement states that students like Butler "are not officers, employees or agents" of EVSC Defendants. (Docket No. 1-1 at ECF p. 107). As the party asserting the agency relationship, Plaintiffs must "prove its existence," *Chellew*, 460 N.E.2d at 1248, and Plaintiffs do not designate evidence that EVSC Defendants and Butler agreed for Butler to act as their agent. *See Glispie*, 955 N.E.2d at 823 (finding plaintiff did not establish an agency relationship without showing "any evidence that [the principal] ever *communicated directly* with [the agent] to manifest its consent to that agency relationship") (emphases added); *see also Bauermeister v. Churchman*, 59 N.E.3d 969, 974 (Ind. Ct. App. 2016) (no actual agency relationship existed where a contract included language that "expressly designated [the purported agent] as an independent contractor."). Thus, based on this record, no rational jury could find that an actual agency relationship exists.

16

Plaintiffs' apparent agency theory is also unavailing. Setting aside, for the moment, that the Court has assumed without deciding that Butler was an employee of EVSC Defendants, and that this theory seeks to hold them liable for the torts of Butler as an independent contractor, the Indiana Supreme Court has not extended vicarious liability for the torts of an apparent agent outside the medical industry. *Ratcliff v. TranStewart Trucking Inc.*, 684 F.Supp.3d 845, 867 (S.D. Ind. 2023) ("To date, the Indiana Supreme Court has imposed such liability only on medical facilities"); *see also Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 152 (Ind. 1999) (adopting apparent agency for vicarious liability claims against hospitals for torts committed by independent contractor physicians); *Arrendale v. Am. Imaging & MRI, LLC*, 183 N.E.3d 1064, 1073 (Ind. 2022) (expanding apparent agency under *Sword* to non-hospital medical entities); *but see Pfadt v. Wheels Assured Delivery Sys., Inc.*, 200 N.E.3d 961, 979 (Ind. Ct. App. 2022) (allowing for an apparent agency claim imposing liability on a trucking company for the tort of one of its drivers to survive summary judgment).

Even if Plaintiffs' apparent agency theory could impose liability on EVSC Defendants, Plaintiffs do not point to evidence of a manifestation made by the principal—here EVSC Defendants—made to a third party, *i.e.,* the parents of these children, that "instilled [them] with a reasonable belief" that Butler was acting as an agent for EVSC Defendants. *Chellew*, 460 N.E.2d at 1248. Plaintiffs point to a permission slip that was sent home with students enrolled in the Vogel daycare asking if they would like for their child to participate in tutoring with UE students. (Docket No. 185 at ECF p. 13). As an initial matter, only two of four children involved in this case were signed up for the tutoring program, (Docket No. 193 at ECF p. 21; Docket No. 196 at ECF p. 21), and only one child participated, (Docket No. 196 at ECF p. 8). The parent whose child participated in the tutoring program stated that her child "came home with a . . . very vague

17

permission slip" which informed her "that tutors from [UE] would come . . . and assist with homework." (Docket No. 193 at ECF pp. 10–11). But this deposition testimony does not indicate, nor do Plaintiffs identify any other evidence showing, that this parent believed that the tutors, including Butler, were acting on behalf of EVSC Defendants as their agents. And Plaintiffs, as the party asserting the agency relationship, bear the burden of proving that an apparent agency relationship exists. *Glispie*, 955 N.E.2d at 822. Thus, without evidence that these permission slips would cause the parents, as third parties, "to reasonably believe that [Butler] was acting as [EVSC Defendants'] agent," Plaintiffs' apparent agency theory cannot succeed. *Ratcliff*, 684 F.Supp.3d at 867.

Because Plaintiffs' do not designate evidence sufficient to show either an actual agency or apparent agency relationship, there is no basis for vicarious liability under agency law. Defendants' Motion for Summary Judgment (Docket No. 177) is **GRANTED** as to Plaintiffs' agency law theory.

## B.  Title IX

In addition to their vicarious liability claims, Plaintiffs assert that, as recipients of federal funds, EVSC Defendants violated Title IX of the Education Amendments of 1972, codified at 20 U.S.C. § 1681 *et seq.* Title IX provides, as a general rule, that "[n]o person in the United States shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Plaintiffs seek to recover monetary damages from EVSC Defendants due to their failure to investigate allegations of the children's sexual assault. (Docket No. 131 at ECF p. 12). While recovery under Title IX is possible, Plaintiffs must meet a "difficult" standard. *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 540 (7th Cir. 2022).

To prevail on their Title IX claim and recover damages, Plaintiffs must show that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination . . . and fails adequately to respond." *Gesber v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998). This official is known as an "appropriate person." 20 U.S.C. § 1682. Additionally, Plaintiffs must show that the appropriate person's failure to adequately respond to the allegations "amount[s] to deliberate indifference to discrimination." *Gesber*, 524 U.S. at 290. The appropriate person acquires actual knowledge of discrimination "upon learning that misconduct rising to the level of sex discrimination *has occurred*." *C.S.*, 34 F.4th at 540 (emphases added). In other words, Title IX liability is conditioned on the appropriate person receiving knowledge of "*completed or ongoing violations*" of Title IX. *Id.* at 541 (emphases in original). When the appropriate person does have actual knowledge, Title IX requires them "to take action to end the harassment or to limit further harassment." *Gesber*, 524 U.S. at 289. "Whether an individual is an appropriate person is fact-specific," and requires courts to "look beyond job titles to evaluate whether an individual possesses the requisite authority." *Wilson v. Johnson*, No. 1:22-CV-336, 2023 WL 8018477, at *5 (N.D. Ind. Nov. 20, 2023) (cleaned up).

The parties dispute *who* the appropriate person is in this case. Plaintiffs assert that Ms. Wilson, as daycare coordinator and the person who had the most direct contact with Butler, is the appropriate person. EVSC Defendants argue that it should be Principal Lindauer. The Court agrees with EVSC Defendants. Generally, the authority necessary to qualify as an appropriate person under Title IX "is not present in the bulk of employees, such as fellow teachers, coaches, and janitors, unless the district has assigned them both the duty to supervise the employee who has sexually abused a student and also the power to halt the abuse." *Id.* (citations and quotations

omitted). Instead, it is often "the superintendent, assistant superintendent, principal, [or] assistant principal, provided they had authority to take corrective action to end the discrimination." *B.W. v. Career Tech. Ctr. of Lackawanna Cnty.*, 422 F.Supp.3d 859, 877 (M.D. Pa. 2019).

While record evidence suggests that Ms. Wilson knew Butler was in the children's restroom on at least one occasion, (Docket No. 228-1 at ECF p. 15), Plaintiffs do not identify evidence showing Ms. Wilson had "authority to institute corrective measures" on behalf of EVSC, *Gesber*, 524 U.S. at 277; *see also Wilson*, 2013 WL 8018477, at *6 (noting that while plaintiffs alleged that athletic coaches "knew about the sexual abuse . . . there are no corresponding allegations that they had authority to take corrective measures" to stop the abuse). Plaintiffs point to the Clinical Education Agreement between UE and EVSC as supplying Ms. Wilson with authority to take corrective measures. But that Agreement only provides that "EVSC may remove a [UE student] . . . for violating EVSC rules and regulations or for such actions the EVSC views as detrimental[.]" (Docket No. 1-1 at ECF p. 108). At most, the Agreement establishes that *EVSC Defendants*, and those with authority to act on behalf of the school corporation, could remove Butler from Vogel's premises. But there is no indication that Ms. Wilson had such authority. Instead, that authority rested with Principal Lindauer. Plaintiffs argue that Principal Lindauer expressly stated that she was not involved in the daycare program and that Ms. Wilson oversaw the program. (Docket No. 186 at ECF p. 21–23). But the fact that Principal Lindauer was not actively involved in the daycare program does not mean that she was not the appropriate person to take corrective actions concerning UE students involved in "[p]re-student teaching." (Docket No. 1-1 at ECF p. 106). Indeed, Principal Lindauer was the person who allowed for UE students to tutor at Vogel. (Docket No. 186 at ECF pp. 13–14).

Principal Lindauer acquired actual knowledge of the abuse on December 3, 2021, when non-party parents met with her and reported that their son had seen a cell phone in the restroom. (*Id.* at ECF p. 54–55). At that point, Title IX required Principal Lindauer "to take action to end the harassment or to limit further harassment." *Gesber*, 524 U.S. at 289. The undisputed facts show that she did. Principal Lindauer spoke with Ms. Malone and Ms. Wilson to gather relevant information. (Docket No. 187 at ECF p. 1). Ms. Wilson provided a sign-in sheet from the previous day and noted that Butler was in attendance. (Docket No. 186 at ECF p. 57). Principal Lindauer spoke with a child, who confirmed that Butler was in the bathroom with him and said that he saw Butler on his phone while in the restroom. (*Id.* at ECF p. 56). Principal Lindauer then contacted an EVSC police officer and reported her findings and concerns about Butler. (*Id.* at ECF p. 57). Such a response does not "amount to deliberate indifference to discrimination." *Gesber*, 524 U.S. at 290; *see also C.S.*, 34 F.4th at 547 (finding that a principal did not act with deliberate indifference when the principal spoke with the teacher and instructed him to limit contact with the student after being informed of an inappropriate relationship between the two).

In short, Plaintiffs do not identify evidence that Ms. Wilson had authority to institute corrective measures to end or limit Butler's actions. Without evidence of such authority, Ms. Wilson cannot be an "appropriate person" under Title IX. 20 U.S.C. § 1682; *Gesber*, 524 U.S. at 290. Instead, the undisputed evidence shows that Principal Lindauer was an appropriate person, and once she had actual knowledge of the discrimination, she informed the authorities about Butler. Because there is no genuine issue of material fact on these issues, EVSC Defendants Motion for Summary Judgment (Docket No. 171) is **GRANTED** as to Plaintiffs Title IX claim.

21

## C. Direct Liability

Finally, Plaintiffs bring direct liability claims against EVSC Defendants sounding in tort.
As this Court has previously stated, Plaintiffs assert the following direct liability claims:
negligence; assumed duty of care; negligent hiring, training, and supervision; and negligent
supervision of a child. (Docket No. 137 at ECF p. 18). In ruling on EVSC Defendants' Motion to
Dismiss, the Court rejected EVSC Defendants' argument that "the only basis upon which EVSC
could be liable for Butler's misconduct under any state tort claim is respondeat superior or
agency law." (*Id.*).

Before that, Plaintiffs submitted their Statement of Claims. Plaintiffs highlight several
direct liability claims against EVSC Defendants, including that "EVSC negligently failed to
supervise the [c]hildren," (Docket No. 131 at ECF p. 5), that EVSC "assumed duties of care" for
the children participating in the tutoring program," (*id.*), and that EVSC Defendants negligently
hired, trained and supervised their respective employees, "including but not limited to . . .
Butler," (*id.* at ECF p. 8). Specifically, Plaintiffs claimed that EVSC Defendants "fail[ed] to
properly train its employees . . . to develop appropriate safety plans, procedures, and protocols
for overseeing the activities of UE's students engaged in clinical education activities, including
Vogel." (*Id.*). The upshot, it seems abundantly clear, is that Plaintiffs asserted direct liability
claims against EVSC Defendants, which this Court did not dismiss.

Despite this, in their Brief in Support of the Motion for Summary Judgment (Docket No.
220), EVSC Defendants do not make a *single* reference to direct liability in forty-three pages of
briefing. Plaintiffs astutely point this out in their Brief in Opposition where they reiterate that
they do, in fact, assert direct liability claims against EVSC Defendants, from the negligent hiring
of Ms. Wilson to their alleged failure to supervise and care for the children. (Docket No. 229 at

ECF pp. 11–17). Plaintiffs argue that EVSC Defendants have waived argument to those direct liability claims. (*Id.* at ECF p. 12). EVSC Defendants attempted to clarify in their Reply Brief that they seek summary judgment on *all* claims, dismissively describing Plaintiffs' waiver argument as "nonsense." (Docket No. 238 at ECF p. 2). EVSC Defendants assert that "[r]egardless of whether Plaintiffs characterize their Counts as direct liability claims or indirect liability claims, each relies on the criminal conduct of Butler as having caused the resulting damage." (*Id.*).

Contrary to EVSC Defendants' argument, there is a difference between direct and vicarious liability claims. The Court highlighted this difference in its previous Order, where it said that "a negligent training and supervision claim seeks to hold the employer *directly liable* for its own failure to supervise an employee who acted outside the scope of his employment." (Docket No. 137 at ECF p. 18) (citation omitted) (emphases added)). Moreover, EVSC Defendants raised this challenge for the first time on reply. Such improperly raised arguments are waived. *See e.g., Winters v Sevier*, No. 1:19-cv-4331, 2020 WL 5500278, at *2 (S.D. Ind. Sept. 10, 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived.") (quoting *O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020)); *Carroll v. Lynch*, 698 F.3d 561, 564 n.2 (7th Cir. 2012) (enforcing the waiver standard).

At bottom, Plaintiffs brought direct liability claims, which the Court allowed to proceed at the motion to dismiss stage. EVSC Defendants did not challenge the direct liability claims in their opening summary judgment brief. After Plaintiffs highlighted these claims in their responsive briefing, EVSC Defendants included a short section challenging the basis for those claims. To the extent EVSC Defendants provide *any* basis for contesting Plaintiffs' direct liability

claims, those arguments are waived. As such, EVSC Defendants' Motion for Summary Judgment (Docket No. 171) is **DENIED** as to Plaintiffs' direct liability claims.

## IV.    Conclusion

For the reasons stated above, EVSC Defendants' Motion for Summary Judgment (Docket No. 171) is **GRANTED** as to Plaintiffs' negligence, negligence per se, NIED, IIED, invasion of privacy, battery, sexual battery, and federal child pornography claims seeking to impose vicarious liability on EVSC Defendants. Similarly, EVSC Defendants' Motion (Docket No. 171) is **GRANTED** as to Plaintiffs' Title IX claim. The motion is **DENIED** as to Plaintiffs' direct liability claims.

**IT IS SO ORDERED.**

Dated:  February 19, 2025

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana

Distribution:

Served electronically on all ECF-registered counsel of record.